AO 106 (Rev. 04/10) Application for a Search Warrant
Case 5:25-mj-00701-CMS    Document 1    Filed 12/30/25    Page 1 of 26
AUTHORIZED AND APPROVED/DATE:  S/MATTHEW P. ANDERSON 12/29/25

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)* | )<br>)<br>)<br>)<br>)<br>) | Case No.    701 |
|---|---|---|

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

❑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | |

The application is based on these facts:

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days (give exact ending date if more than 30 days:(_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date:    December 30, 2025
_____

_____
*Judge's signature*

City and state: _____
_____
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

**IN THE MATTER OF THE SEARCH OF THE EXTRACTION OF AN APPLE IPHONE 16E, SERIAL NUMBER GVQYHXH9R5, CURRENTLY LOCATED AT 3625 NW 56TH ST, SUITE 300, OKLAHOMA CITY, OKLAHOMA 73112**

**Case No.  MJ-25-701-CMS**

**FILED UNDER SEAL**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION
## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kyle Boeck, being first duly sworn under oath, depose and state

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property—an extraction of an electronic device—which is currently in law enforcement possession, as described in Attachment A, and the seizure from that property of electronically stored information, as described in Attachment B.

2.      I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within the category of officers authorized by the Attorney General to request such a warrant. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since December 2022. My duties and responsibilities include conducting criminal investigations of individuals

and entities for possible violations of Federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code.

3.      Through my training, education, and experience, I have become familiar with the manner in which individuals involved in drug related crimes operate, and the efforts of those involved in such activity to avoid detection by law enforcement. I know, based upon my training and experience, as well as information relayed to me during the course of my official duties, that criminals involved in drug related crimes routinely use a variety of different methods and platforms to communicate relating to their criminal activity, including but not limited to wire and electronic communication facilities, including multiple cellular telephones, public telephones, the internet, including email, social media networks, and applications (e.g. TextNow).

4.      I am familiar with the facts and circumstances of this investigation. The facts set forth in this affidavit are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open-source information including information available on the Internet. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

5.      Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute of controlled substances) and 846 (drug conspiracy)

have been committed by **ALEXANDER RHODES**, **a/k/a ADDIE** (hereinafter, **ADDIE**). There is also probable cause to search the information described in Attachment A for evidence, fruits, and instrumentalities of these crimes, as described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.     The information to be searched is information that had been contained on an **APPLE IPHONE 16E**, serial number **GVQYHXH9R5**, hereinafter the "**Device**." The **Device** has been extracted, as described below, and the extraction is currently located at 3625 NW 56th St, Suite 300, Oklahoma City, Oklahoma 73112. The extraction is the property described in Attachment A.

7.     The applied-for warrant would authorize the search of the forensic examination of the information that has been extracted from the **Device** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.     In March 2025, the Oklahoma City Police Department (OCPD) initiated an investigation targeting **ADDIE** and his brother, Charlton Rhodes, a/k/a Chachi (CHACHI). The investigation was opened based on intelligence provided by a confidential human source (CS1).[1] CS1 affirmed ADDIE and CHACHI (collectively, the Rhodes Brothers)

---

[1]     CS1 was not promised anything in exchange for his/her cooperation but has received seven monetary payments for his/her services in this investigation to date, the most recent payment being in December 2025. Information provided by CS1 has been reliable to the best of my knowledge, and I am unaware of any false information provided by CS1. Information herein attributed to CS1, unless otherwise noted, was obtained by CS1 through his/her personal observations and conversations with targets of this investigation and their associates.

traffic large amounts of cocaine, methamphetamine, and MDMA (ecstasy) in the Oklahoma City area. CS1 provided that the Rhodes brothers have the drugs shipped via various parcel services from their source of supply in California.

9.    During the first half of May 2025, law enforcement used CS1 to conduct a controlled drug purchase of MDMA pills from **ADDIE**. CS1 contacted **ADDIE** at telephone number (405) 831-7770 and coordinated the purchase of MDMA bars for roughly $1.00 per bar. CS1 traveled to **ADDIE**'s residence for the deal. During the controlled buy, **ADDIE** pulled out a duffel bag with what appeared to be several thousand MDMA bars inside it. This meeting was also recorded, as CS1 was equipped with an OCPD-issued recording device, and the recording is maintained by OCPD and the FBI. Following CS1's purchase of the MDMA bars, one of the bars field-tested positive for MDMA.

10.    In June 2025, Special Agents and OCPD Task Force Officers (TFOs) assigned to the FBI initiated a joint investigation targeting **ADDIE** and CHACHI.

11.    In the second half of June 2025, CS1 provided law enforcement with a video **ADDIE** posted on Facebook under the display name "Addie Cuz." This Facebook account has multiple photos/videos of an individual that appears to be **ADDIE**, based on his driver's license photos. In one video, there appear to be multiple bottles of different flavors of an edible marijuana product. Based on my training and experience, I believe that **ADDIE** utilized a cellular phone to record the video before posting the video to Facebook. I believe this is the case given the way the video was filmed and due to the ordinary course in which

people take photographs or videos using their cellular devices to post to social media, typically accessed by those same cellular phones.

12.    In the first half of July 2025, CS1 provided law enforcement with a video that **ADDIE** posted on Facebook, which appeared to include more of the same type of bottles of marijuana products from the prior video. Further, **ADDIE** is also seen with bulk cash in the video. Based on my training and experience, I know drug traffickers typically possess bulk cash from illicit sales of illegal drugs. I further know that drug traffickers typically take photographs of themselves with bulk currency. Given that the investigation has shown that **ADDIE** has no current employment, I believe the bulk cash in the video consists of drug proceeds. Again, based on my training and experience, I believe that **ADDIE** utilized a cellular phone to record the video before posting the video to Facebook. I believe this is the case given the way the video was filmed and due to the ordinary course in which people take photographs or videos using their cellular devices to post to social media, typically accessed by those same cellular phones.

13.    Again in the first half of July 2025, CS1 provided law enforcement with another video that **ADDIE** posted on Facebook, which included more of the same type of bottles from the prior videos. Further, the video showed a clear bag containing multi-colored bars behind the bottles, and one bag containing a white substance. Based on the controlled purchases of MDMA bars conducted by CS1, the multi-colored bars in the bag appear to be MDMA bars. The white substance, based on my training and experience, appears to be methamphetamine. Again, based on my training and experience, I believe that **ADDIE** utilized a cellular phone to record the video before posting the video to

Facebook. I believe this is the case given the way the video was filmed and due to the ordinary course in which people take photographs or videos using their cellular devices to post to social media, typically accessed by those same cellular phones.

14.    In July 2025, law enforcement utilized CS1 to conduct two controlled drug purchases from the Rhodes brothers. First, CS1 contacted **ADDIE** at telephone number (405) 831-7770 and coordinated the purchase of MDMA bars for a set price. The deal occurred in an apartment complex, and **ADDIE** pulled the MDMA bars from a duffel bag that contained several thousand MDMA bars. The duffel bag also contained several kilograms of suspected methamphetamine. A sample of the MDMA bars field tested positive for MDMA. Second, CS1 contacted CHACHI and coordinated the purchase of pound-quantities of methamphetamine for a set price. CS1 met CHACHI at the agreed-upon meeting spot and entered CHACHI's vehicle. CS1 then purchased the methamphetamine (as confirmed by a field test) and exited the vehicle.

15.    Also in July 2025, investigators seized two packages shipped via FedEx from California on the same day and from the same location. The two packages together contained a total of approximately five kilograms of a substance that appeared to be cocaine. The suspected cocaine is currently at the DEA lab for testing. One package was intended for 7201 NW 122nd Street, Apartment 4307, Oklahoma City, Oklahoma. At the time, this apartment was rented by Qwinnetta MITCHELL.[2] The second package was

---

[2]    Based on the investigation, law enforcement believes that **ADDIE** and MITCHELL are in an ongoing relationship. This is based on MITCHELL frequently appearing on **ADDIE**'s toll records and CashApp transactions. Further, as discussed below, **ADDIE** and

intended for 4200 N Meridian Avenue, Apartment 811, Oklahoma City, Oklahoma. At the time, this apartment was rented by Ebony HUMPHREY, who also regularly appears on **ADDIE**'s toll records and CashApp transactions as well. Based on my training and experience, as well as the investigation to date, I believe that the two packages were intended for **ADDIE**.

16.     **ADDIE**'s connection to cocaine distribution was solidified in September 2025, as a result of a search in an unrelated investigation. On September 4, 2025, OCPD executed a search warrant at the residence of Latrell WARD, 721 NE 32nd Street, Oklahoma City, Oklahoma. As a result of the search warrant, law enforcement located and seized 9 grams of cocaine, 42 grams of MDMA powder, and 67 grams of MDMA capsules. WARD was detained in connection with the execution of the search warrant. While detained, and after he was read his *Miranda* warnings, WARD told law enforcement that he purchased cocaine from **ADDIE** in ounce quantities. WARD told law enforcement that he believed that **ADDIE** traveled to Los Angeles, California to acquire cocaine and returned with several kilograms at a time.

17.     As a result of the above investigation, law enforcement has concluded that **ADDIE** distributes multiple illegal substances, including marijuana, MDMA, methamphetamine, and cocaine. Further, law enforcement has concluded that **ADDIE** sources his illegal drugs from a source of supply based in California. Further, **ADDIE** utilizes a cellular phone, like the **Device,** in connection with orchestrating drug sales.

---

MITCHELL returned to the United States from Germany together, suggesting a vacation together.

Further, **ADDIE** likely uses a cellular phone, like the **Device**, to take video recordings of the illegal drugs and drug proceeds.

18.    On October 6, 2025, Homeland Security Investigations (HSI) O'Hare encountered **ADDIE** and MITCHELL at O'Hare International Airport (ORD) upon their arrival into the United States on United Airline Flight 945 from Frankfurt, Germany. HSI O'Hare Special Agents (HIS SAs) conducted a manual examination of **ADDIE**'s two cellular telephones, including the **Device**, in accordance with the Border Search exception to the Fourth Amendment. Upon examining the **Device**, HSI found indicia of drug trafficking on the **Device**, including a photograph and videos of illegal drugs and apparent drug proceeds.  The **Device** was forensically extracted, and the extraction is currently in the lawful possession of HSI. The **Device** itself has been returned to **ADDIE**.

19.    The **Device**'s extraction is currently in storage at 3625 NW 56th St, Suite 300, Oklahoma City, Oklahoma 73112. In my training and experience, I know that the **Device** extraction been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **Device** first came into the possession of HSI.

### Technical Terms

20.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.    Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through

networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by phones and computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every phone or computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP

addresses. Some phone and computers have static—that is, long-term—IP addresses, while others have dynamic—that is, frequently changed—IP addresses.

g.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and to access the internet and utilize IP addresses. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

22.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23.     I know that cellular telephones are often equipped with digital cameras and those phones possess the capability to transmit and/or store electronic images. I know that in many cases, cellular telephones maintain photographs of illegal activities to include evidence of illegal drug trafficking. These photos are sometimes stored in their cellular

phones and often are transmitted or sent from one electronic media device to another. I also know that cellular phones may also contain notes regarding potential illegal acts that are recorded by the subject who possesses the electronics. Furthermore, I know that text messages, emails are often used by two or more persons to communicate information regarding illegal activities, between principals and co-conspirators of those crimes.

24.     I know that cellular telephones are utilized by the majority of individuals in the United States and have become a staple of communication between individuals using text messaging, visual and audible communications (telephone calls and FaceTime type communications) as well as applications like "Signal" and "TextNow." Additionally, individuals utilize their cellular devices to take pictures, keep notes, as a GPS (global positioning System) device, and even to conduct illicit or illegal activity. Communications on phones are kept for long periods and transferred from one phone to another when replaced. This is done through the use of Cloud storage and direct transfer conducted at the time of purchase or by the individual themselves. Individuals utilize this method as not to lose data that is stored on the phone such as contacts, photos, notes, and other important information to the individual. This data includes contacts used to conduct illegal activities to include drug trafficking.

25.     Based on my education, training, and experience, I know that individuals involved in the use, sales, manufacturing, and transportation of illegal narcotics often use cell phones and other electronic devices to further their trade by conducting business on them via text messages and phone calls. I also know from my training, education, and experience that:

a. Drug distributors/traffickers commonly maintain books, records, receipts, notes, ledgers, and other documents/papers both electronically and in paper form, which relate to the transportation, ordering, sale, and distribution of controlled substances, even though such documents may be in code and/or identify customers/sources/co-conspirators through monikers/nicknames. Documentation such as this oftentimes results because drug distributors/traffickers commonly "front" drugs (provide controlled substances on consignment) to their clients and must account for these transactions in order to collect outstanding drug debts.

b. Drug distributors/traffickers commonly maintain addresses or telephone numbers in notebooks, papers, cellular phones, computers and electronic storage media which reflect names, address, and/or telephone numbers for their associates in the drug distribution/trafficking organization, even if said items may be in code, and such traffickers send and receive items listed in this affidavit by mail and other common carriers.

c. Drug users, distributors and traffickers frequently take, or cause to be taken photographs or videotapes of themselves, their associates, their property/assets, and their product, and these individuals usually maintain these photographs or recordings/videos in the residences under their control. These photographs and videos are also often found in the individual's cellular telephone, computers and other electronic storage media.

d.  Cellular telephones are often used to facilitate offenses and allow criminals to maintain communication with each other before, during and after the commission of offenses. I am aware that cellular telephones have the capacity to store a vast amount of information, including but not limited to: telephone numbers, voice messages, text messages, e-mail, photographs, videos, address books, records, phone call histories, contact and other information. This information may be contained on the cellular telephone.

e.  Text messages and e-mails are often used by two or more persons to communicate information regarding illegal activities between two telephones or between one telephone and a personal computer. This information can include directions for deliveries, stash locations, prices, cell phone contact numbers, and instructions.

f.  Cellular telephones often contain stored phone numbers and contact information of individuals that conduct business with other co-conspirators that possess the cellular telephone.

g.  When drug users/dealers/traffickers use text messages to discuss topics such as quantities, prices, and the quality of controlled dangerous substances, as well as dates, times and locations for drug transactions, these communications are often in coded drug talk/jargon and require review by peace officers experienced in deciphering such communications.

h.  In my experience in searching cellular telephones possessed by known drug users/distributors/traffickers, photos and/or videos have been discovered which

evidence the use and distribution of controlled dangerous substances and the proceeds intended for or derived therefrom. This evidence often depicts pictures/videos of drugs for showing drug quality, condition or quantity. Moreover, users will commonly document episodes of drug use in social settings. Additionally, drug distributors will take pictures ("trophy" pictures) or otherwise capture digital recordings for the purpose of memorializing their credibility/capability as a drug dealer and accomplishments (acquisition of assets/large amounts of U.S. currency) relating thereto.

i.   In all phases of drug distribution, the utilization of cellular telephones is essential. Drug users/dealers/traffickers use cellular telephones to place calls, as well as communicate by SMS text messaging. As drug dealing necessarily entails constant communications with accomplices, co-conspirators, clients, and sources, these communications virtually always take place by voice calls and text messaging over cellular telephones.

j.   Cellular telephones are almost always used by drug distributors as a way to communicate. They will communicate by verbal conversations, digital text messaging, and/or sending photographs to one another. To avoid detection, drug distributors will oftentimes speak in coded language or through use of vague messages. Sometimes the cellular telephone numbers they use are listed in a different individual's name or they will frequently change phone numbers. Drug distributors will often "drop" or switch cellular phones to avoid detection by law

enforcement. This will result in the accumulation of several different cellular phones.

26.    *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Device** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a

computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28.  *Manner of execution.* Because this warrant seeks only permission to examine a device extraction already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

29.  *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the crime(s) under investigation, including but not limited to undertaking a cursory inspection of all information within the **Device**. This method is analogous to cursorily inspecting all the

files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with stored cellular device data, such as pictures and videos, do not store as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications associated with a cellular device, as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications. Consequently, often many communications in cellular device data that are relevant to an investigation do not contain any searched keywords.

### Conclusion

30.    Based on the information above, I submit that there is probable cause for a search warrant authorizing the examination of the **Device** described in Attachment A to seek the items described in Attachment B.

31.     I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.



Respectfully submitted,


Kyle Boeck
Special Agent
Federal Bureau of Investigation



Subscribed and sworn to by phone on December 30, 2025.


CHRIS M. STEPHENS
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to be Searched

The property to be searched is an extraction of an **APPLE IPHONE 16E,** serial number **GVQYHXH9R5**, hereinafter the "**Device**." The **Device** extraction is currently located at 3625 NW 56th ST, Suite 300, Oklahoma City, Oklahoma.

This warrant authorizes a search of the forensic extraction of the **Device** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of the crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely a violation of Title 21, United States Code, Section 841(a)(1) and Title 21, United States Codes, Section 846:

1.      All records on the extraction of the **Device** described in Attachment A that relate to the unlawful drug possession and distribution in violation of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute of controlled substances) and 846 (drug conspiracy), including:

      a.      lists customers and related identifying information;

      b.      lists of co-conspirators and related identifying information;

      c.      records of communication with others related to the criminal offense(s) listed above; including incoming and outgoing voice messages; text messages; emails; multimedia messages; applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

      d.      records detailing the types, amounts, or prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

e.    any information related to the sources of drugs, including names, addresses, phone numbers, or any other identifying information;

f.    any audio recordings, pictures, video recordings, or still-captured images on the extraction of the **Device** related to the purchase, sale, transportation, or distribution of controlled substances or the collection, transfer, or laundering of drug proceeds;

g.    records relating to documentation or memorialization of the criminal offense(s) listed above, including voice memos, photographs, videos, and other audio and video media, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos, including device information, geotagging information, and information about the creation date of the audio and video media;

h.    records relating to the planning and execution of the criminal offense(s) above, including Internet activity, firewall logs, caches, browser history, and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

      i.     records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the criminal statutes listed above

      j.     application data relating to the criminal offense(s) above;

      k.     all bank records, checks, credit card bills, account information, and other financial records; and

      l.     any location data related to the acquisition or distribution of controlled substances.

2.     Evidence of user attribution showing who used or owned the **Device** described in Attachment A at the time the things described in this warrant were created, edited, or deleted, including:

      a.     logs, phone books, saved usernames and passwords, documents, and browsing history;

      b.     text messages, multimedia messages, email, email messages, chats, instant messaging logs, and other correspondence;

      c.     photographs;

      d.     records of Internet Protocol addresses used; and

      e.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search

terms that the user entered into any Internet search engine, and records of user-typed web addresses.

3.    Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, instrumentalities, contraband, and/or fruits described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.